MORTON and others, assignees of Gwathmey, *vs.* ROGERS and others.

</div>

Where, on the settlement of an account, a debtor gave to his creditor a promissory note, payable to a *third person,* for a portion of the *assumed balance,* and two drafts for the residue, and after the payment of the drafts an action was brought upon the note by the assignees of the *payee,* who had been discharged as an insolvent debtor, *it was held* that it was competent to the defendant to show an error in the statement of the account, and that the plaintiffs were entitled to recover only the *true balance* due at the time of the settlement, deducting the amount of the drafts paid by the defendant.*

ERROR from the supreme court. J. A. Morton and J. Low, jun., *assignees* of H. B. Gwathmey, *an insolvent debtor,* brought an action in the superior court of the city of New-

---

* The *judgment of reversal* in the supreme court was based upon two principles: 1. Admitting Gwathmey to have held the note *in his own right,* still, it having been proved to have been obtained from the makers by *misrepresentation,* it was incumbent upon the plaintiffs to show that Gwathmey

York, against E. N. Rogers and two others, and declared on a promissory note, bearing date 2d January, 1828, payable the first day of October, then next, for $2000, with interest from 26th October, 1827. On the trial of the cause, the signatures of the defendants to the note, as makers, were admitted, and the plaintiffs proved their appointment as assignees of Gwathmey, in proceedings had for his discharge as an insolvent debtor, and rested. The defendants thereupon, in pursuance of a notice attached to their plea of the general issue, proved the settlement of an account between themselves and one *John Grimshaw*, on the 2d January, 1828, wherein a balance of $5337,61 was claimed against them, on the 30th September, 1827. One of the items of indebtedness in which account, was a draft of the defendants on *John Richards*, of New-Orleans, for $2000, drawn 10th November, 1826,

---

was a *bona fide* holder of the note for value—upon the principle that where the maker of a note shows it to have been obtained from him by *force* or *fraud*, the presumption of law that the holder rightfully came to the possession of it is rebutted, and consequently he is not entitled to recover without proving the consideration paid by him ; and 2. That the note being *payable to Gwathmey*, he must be considered as an *original party* to the transaction, and of course inquiry may be made into the original consideration.

The CHANCELLOR, in the opinion delivered by him in the *court for the correction of errors*, substantially concurs in the views of the case taken by the supreme court. *Senator* TRACY, however, whilst he subscribes to the conclusion that *Gwathmey* must be considered in law, as he is in fact, the *payee* of the note, that he is not entitled to the rights of an *endorsee*, and that of course inquiry may be made into the consideration of the note, differs from the supreme court and the chancellor in the opinion that the subsequent holder of negotiable paper is bound to show the consideration paid by him, upon mere proof that the note was obtained or put into circulation fraudulently. On the contrary, he is of opinion that the presumption of law is that such subsequent holder obtained the paper *bona fide*, and for value, until it be proved that the maker or a previous holder was *dispossessed* of it *without his consent*, or that the party seeking to enforce its payment was privy to the alleged fraud.

The CHANCELLOR and *Senator* TRACY concur in disapproving of the rule adopted in some of the later *English cases*, that an *endorsee* of negotiable paper is bound to prove himself a *bona fide* holder for value, upon mere proof of *defect of consideration*, as between the original parties.

*Senator* TRACY also expresses his doubts as to the soundness of the rule, subjecting negotiable paper in the hands of an *endorsee*, taken in payment or security for a *precedent debt*, to the equities subsisting between the original parties.

payable in 90 days which was returned to New-York, *pro-tested*, on 10th March, 1827, and of which draft Grimshaw *claimed to be the holder*. The defendants gave Grimshaw a draft on a New-Orleans house for $1500 ; another on a house at Mobile for $1050, and made the note now in suit payable to *G. H. B. Gwathmey* : for which securities Grimshaw gave them a *receipt* as collateral, for the amount due to him. The defendants proved that at the time of the set-tlement one *Jeremiah Thompson*, and not Grimshaw, was the holder and owner of the draft drawn on John Richards ; and that on the 20th January, 1828, Thompson sold the draft to one Samuel Bell, to whom it was subsequently paid by the defendants, who also paid by the two drafts drawn by them on New-Orleans and Mobile ; and insisted that the *item* of $2000 for the draft on Richards ought to be deducted from the account of Grimshaw, and that then, after crediting them with the drafts of $1500 on New-Orleans, and $1050 on Mobile, the balance due to Grimshaw would be only $822,24 ; which sum, with the interest thereof, from 26th October, 1827, they insisted was all that the plaintiffs were entitled to recover ; contending, that as to the *balance* of the note of $2000, they had received no consideration from either Grimshaw or Gwathmey ; that the facts shewed either fraud or a partial want of consideration ; either of which consti-tuted a defence as to the balance of the note, and cast on the plaintiffs the burthen of proving that a *consideration* pass-ed from Gwathmey to Grimshaw ; that no such considera-tion being shown, Gwathmey should be considered as a *trus-tee* or agent for Grimshaw, and that consequently the same de-fence was admissible, as if the note had been made payable to Grimshaw, and the suit brought in his name. The de-fendants having, previous to the trial, given notice to the plaintiffs that they would be required to show the considera-tion, if any, paid by Gwathmey to Grimshaw. On the part of the plaintiffs it was shown that *Thompson* bought the draft of the defendants on Richards at the recommendation of Grim-shaw ; that in the summer of 1827, after the draft was re-turned protested, Thompson upbraided Grimshaw for having induced him to purchase it ; who thereupon offered Thomp-

son $1700 for the draft, and Thompson agreed to sell it to him for that sum, and kept it for him until Grimshaw's failure, in the latter part of October, 1827. Grimshaw did not pay the money, or tender it, and never was the holder of the draft, and in January, 1828, Thompson sold it to Bell. Grimshaw failed for upwards of $100,000 ; his failure was a bad one ; he did not pay his confidential creditors. The chief justice of the superior court charged the jury, that the plaintiffs were entitled to recover the *whole amount of the note,* and the jury found accordingly. The defendants having excepted to the decision of the court, sued out a writ of error, removing the record into the supreme court, where the judgment of the superior court was *reversed.* (*See Opinion delivered in Supreme Court,* 12 *Wendell,* 487.) The plaintiffs thereupon sued out a writ of error, returnable in this court.

The cause was argued here by

*S. Stevens,* for the plaintiffs in error.

*A. G. Rogers & J. W. Gerard,* for the defendants in error.

Points insisted on by counsel for plaintiffs in error :

1. By intendment of law the note in question was the property of Gwathmey at the time of, and passed by his assignment to the plaintiffs as his assignees, under the insolvent act.

2. Although the note was made payable to the order of Gwathmey, yet he was not in fact, and is not to be deemed in law, an original party to the note.

3. As between the defendants and Gwathmey, the latter holds the relation, and is entitled to the character of endorsee of the note, to whom the same had been negotiated by Grimshaw, with the knowledge and assent of the defendants.

4. Therefore Gwathmey is, prima facie, to be considered a holder for a valuable consideration, and cannot be called upon *by the defendants* to prove a consideration until *his title* to the note, (or in other words, until *the bona fides of the transfer to him*) is impeached.

5. The *title of Gwathmey* to the note in question was in no manner impeached, and therefore he was not by law required to prove what consideration he gave for it.

6. But if Gwathmey is to be deemed an original party to the note, the original consideration as respects him was not impeached by the evidence; there is no proof or pretence that he was privy to or cognizant of any fraud in the consideration.

7. The defendants should have given notice to Gwathmey of the fraud in the consideration, as soon as discovered, and having failed to do so, they are precluded from urging it as a defence to the note.

8. By the exercise of ordinary care and common prudence, the defendants might have ascertained whether Grimshaw in fact held the $2000 draft upon Richards, or not, and they ought not to be permitted, as against a third person, to set up or urge a fraud against which the exercise of common and ordinary caution would have protected them.

Points insisted on by counsel for defendants in error:

1. This being an action by the payee of a note against the maker, the consideration is enquirable into. The consideration of a note may always be enquired into between the immediate parties, and fraud or a total or a partial failure, or want of consideration, may be shown by the maker as against the payee. The facts proved at the trial showed that neither the payee Gwathmey, nor Grimshaw, gave to the makers any consideration for the note as to the amount *defended,* and were therefore properly admissible in evidence.

2. Gwathmey is to be considered as trustee or agent for Grimshaw, or rather as having lent him his name as payee of the note, and the same defence can be made against Gwathmey as could have been made against Grimshaw, had the note been made payable to Grimshaw, and the suit brought by him.

3. But even if Gwathmey is to be considered in the light of, and entitled to all the privileges of an *endorsee,* (that is if the note had been made payable to Grimshaw, and by him endorsed to Gwathmey,) yet when the fraud on which the note was obtained from the defendants by Grimshaw was proved,

ALBANY,
Dec. 1835.

Morton
v.
Rogers.

the *onus probandi* was thrown on Gwathmey, (even if he had been an endorsee) to shew that a consideration passed from him to Grimshaw for the note, agreeably to the notice served by the defendants on the plaintiffs ; and no evidence having been offered on his part of any consideration whatever, although the defendants insisted he was bound to shew it, he is to be considered as a party to the note, without any consideration being given therefor by him.

4. The suit being brought by the assignees of Gwathmey, does not alter the rights or obligations of the parties ; the assignees' *only represent him,* and all the rules of law and evidence that can be urged against him are available against them.

The following opinions were delivered :

By the CHANCELLOR. In ordinary cases, the beneficial owner of a bill of exchange or negotiable note, which is payable to bearer, or is endorsed in blank, may institute a suit thereon in a court of law, in the name of any one who is willing to allow his name to be used for that purpose ; and where the defendant has no legal or equitable defence to the bill or note, as against the real owner thereof, he cannot be permitted to show that the nominal plaintiff, in whose name the suit is so brought, is not the real party in interest. This was so settled by the supreme court in *Lovell* v. *Evertson,* 11 *Johns. R.* 52, and by this court, in *Cooper* v. *Kerr, cited* 3 *Johns. Cas.* 264. The possession of a bill or note which is payable to bearer, or endorsed in blank, is prima facie evidence of ownership ; and also that the holder received it upon a valuable consideration paid therefor, in the usual course of trade or business. As a general rule, therefore, even where there is a failure of consideration, or other equitable defence, as between the defendant and the drawee or payee of the bill or note, or his immediate endorser, he cannot call upon the plaintiff to prove when or upon what consideration the bill or note upon which the suit is brought was transferred to him, or how it came into his hands. *Byles on Bills,* 61. The defendant, however, may, in such cases, show by his own testimony, the

want of consideration as between him and the immediate party with whom he contracted, and that the suit is brought for his benefit ; or that the plaintiff received the bill or note, with a knowledge of the defendant's equitable rights in relation to the same, or under such circumstances that he cannot be considered the bona fide holder thereof. But when the defendant shows, upon the trial, that the instrument on which the suit was brought was lost or stolen, or that it was obtained from him either fraudulently or by force, or that it has been obtained by force or fraud from any previous holder, and put in circulation without the consent of the owner, this forms an exception to the general rule ; and the defendant, upon the proof of those circumstances, may require the plaintiff to show that the note or bill came into his hands, or into the hands of some other person from whom he rightfully received the same, for a good consideration, before it was due and dishonored, and in the usual course of trade or business. *Vallett* v. *Parker*, 6 *Wend.* 615. *Holme* v. *Carpser*, 5 *Binn. R.* 469. *Jackson* v. *Heath*, 1 *Bailey's R.* 355. *Patterson* v. *Hardacre*, 4 *Taunt. R.* 114. In some of the modern cases in England the courts of that country had attempted to go farther—so as to require the plaintiff to show how the bill or note came to his hands, upon mere proof of failure of consideration as between the defendant and the original holder ; although it had neither been lost or stolen, or obtained by force, or fraudulently, from the defendant or a previous holder. Such appears to have been the opinion of three of the judges of the king's bench, in the case of *Heath* v. *Sampson*, 2 *Barn. & Adolph.* 291, in which it was held, that in all cases where, from defect of consideration, the original payee could not recover on the note or bill, the endorsee, to maintain an action against the maker or acceptor, must prove a bona fide consideration given by himself or a prior endorsee. Mr. Justice Parke, however, insisted upon confining the rule of throwing the *onus probandi* upon the plaintiff, to those cases in which the note or acceptance had been obtained by felony, fraud, or duress ; or where it had been lost. But in the still more recent cases, which have arisen under the new rules of pleading in England, the courts appear to have rejected a construction which

would throw upon the holders of accommodation bills or notes the *onus* of showing that they had received them in the ordinary course of business, and paid a sufficient consideration therefor. *See French* v. *Archer,* 2 *Dowl. Pr. R.* 130. *Stein* v. *Yglesias, id.* 252. *Lowe* v. *Chifney,* 5 *Moore & Scott,* 95. *Branah* v. *Roberts,* 1 *Bing. R. N. S.* 465. And in a late case, in an action by an endorsee against the acceptor of a bill of exchange, where the defendant offered proof that there was no consideration for his acceptance, and insisted that the *onus* was thrown upon the plaintiff of proving the consideration of the endorsement to him, Mr. Justice Patteson, before whom the cause was tried, decided that question against the defendant. *Whittaker* v. *Edmunds,* 1 *Moody & Rob. R.* 366. The learned judge says, " I am of opinion that the evidence offered by the defendant, will not make it necessary for the plaintiff to prove the consideration which he gave for the bill. Since the decision of *Heath* v. *Samson,* the consideration of the judges has been a good deal called to the subject; and the prevalent opinion amongst them is, that the courts have of late gone too far in restricting the negotiability of bills and notes. If indeed the defendant can show something of fraud in the previous steps, or the transfer of the instrument, that throws upon the plaintiff the necessity of showing under what circumstances he became possessed of it."

The principles which I have stated may, therefore, be considered as the present commercial law of England, and of those states where the negotiability of bills and notes is not restricted by local regulations or usages. Such at least is the law of this state. And applying these principles to the case under consideration, I think the plaintiffs were not entitled to recover the full amount of this note, without proof on their part to show when, and under what circumstances, it came into the hands of Gwathmey; and that at the time of his discharge under the insolvent act he was the bona fide holder and owner thereof.

It may be proper here to remark, that the plaintiffs only sue as the assignees of Gwathmey under the insolvent act, and not as the mere holders of a note payable to bearer or endorsed in blank; and although the note was taken in Gwath-

mey's name, they are not entitled to recover any part thereof in this section, unless he was the beneficial as well as the nominal owner thereof at the time of his discharge under the act. If he held it merely as the trustee for Grimshaw, or of some other person, or if it never was in his possession as the beneficial holder thereof or otherwise, the legal title to the note did not pass to the assignees by the assignment under the insolvent act; and the suit in that case should not have been in their names as assignees, but in the name of Gwathmey himself. *Garr* v. *Gomez*, 9 *Wend*. 653. At the time the note was given, it was clearly the note of Grimshaw; although for some reason which was not stated at that time, he took it in the name of a third person. I have not been able to find any evidence in the case to show, or from which it can be legally inferred, that the note ever was in the possession of Gwathmey, either before or since his discharge under the insolvent act. It does not even appear that it was inventoried by him as a part of his property; and the possession of the note by the plaintiff's attorney at the trial is not any evidence that it belonged to the plaintiffs in their character of assignees, or that it had ever been in the possession of the insolvent. In the absence of all proof that the note ever was in the possession of Gwathmey, the nomimal payee in whose name it was taken by Grimshaw, upon the settlement of an account due to himself, I think it might have fairly been inferred that the note continued in the hands of Grimshaw until the bringing of this suit, when it was put into the hands of the plaintiff's attorney to be collected for Grimshaw's benefit; and as it was taken by him in the name of Gwathmey, and had not been endorsed, he may have supposed it was proper to bring the suit in the names of the assignees of the nominal payee. Even if there had been a mere failure of consideration after the giving of the note, and without any proof of a fraudulent misrepresentation in obtaining it from the defendants, I think these circumstances of suspicion were sufficient to prevent a recovery of any thing more than was equitably due as between the defendants and Grimshaw, unless the plaintiffs could show that the note had been actually delivered to Gwathmey for a good consideration, before his discharge under the insolvent act.

ALBANY,
Dec. 1835.

Morton
v.
Rogers.

But there was evidence in this case of actual fraud, in obtaining from the defendants a note for a much larger sum than was due to Grimshaw, under the false pretence that he was the holder of the New-Orleans draft; and if it had appeared that Gwathmey was in the actual possession of the note before it fell due, the evidence of that fraud alone would have been sufficient to throw upon the plaintiffs the burthen of proving how and under what circumstances he came by it, and that he paid a good consideration therefor. Chief Justice Jones, who delivered the opinion of the superior court, thinks there was no evidence of fraud in obtaining the note from the defendants, by representing himself as the holder of the New-Orleans draft; and that Grimshaw might honestly have supposed himself to be the owner of that draft, because Thompson had agreed, in the spring or summer previous to the giving of the note, to let him have the draft, provided he paid $1700 therefor. But even if the transaction had occurred immediately after the conversation with Thompson took place, and when Grimshaw supposed he should be able to pay the $1700 and take up the draft, he could hardly have justified himself as an honest man, in representing to the defendants that he was the holder of the draft, and obtaining their negotiable securities for the amount on the faith of that representation, without informing them that the draft was still in the hands of Thompson, who would have the right to collect the whole amount thereof from them unless he paid the $1700 and took it up. It must also be recollected that the circumstances of Grimshaw had materially changed at the time this transaction took place, in January, 1828, from what they were the summer previous, when the contract for the conditional purchase of the draft was made with Thompson. He had failed some time in October, 1827, for a very large sum, or as one of the witnesses says, "it was a bad failure." He was therefore insolvent at the time he represented himself to the defendants as the holder of the draft, and at that time he could not have expected to be able to pay the $1700, so as to entitle himself to it. It was therefore a gross fraud upon the defendants to obtain from them their negotiable securities, upon that false representation, and when

he must have known that the defendants would not have given them to an insolvent man, if he had told them the true state of the case. Neither can I see any good reason why he should have taken this note in the name of a third person, unless he intended to dispose of it in such a manner that the makers could not protect themselves against the payment thereof when the fraud should be discovered. Other facts may give a different coloring to this transaction; and if any exist it will be but an act of justice to Grimshaw that the plaintiffs should call him as a witness, and thus give him an opportunity to throw light upon this dark transaction. As the testimony now stands in this record, it appears that the note was obtained from the defendants by actual fraud; and the plaintiffs ought not to have been permitted to recover any more than was equitably due as between the defendants and Grimshaw, without showing that the note was received by Gwathmey *bona fide*, in due course of business, and for a good consideration.

The judgment of the supreme court, reversing that of the superior court of the city of New-York, was therefore right, and it should be affirmed.

By Senator TRACY. If I considered the decision of this case, to turn wholly on the question that has been chiefly discussed through all the stages of the suit, I should be for reversing the judgment of the supreme court, and for affirming that of the court below. I am not prepared to sanction the doctrine to the extent to which it has been recently carried in England, that the endorsee of a bill of exchange or promissory note, the consideration of which is impeached in whole or in part, may be compelled to show that he became the holder for a valuable consideration. I do not propose to discuss this proposition at length, for in my view it is not necessarily involved in this case; but under the circumstances in which it is now presented, I deem it proper to state briefly why I am unwilling to be concluded by the opinion which the supreme court seems to entertain of it.

I had always supposed it to be well settled as a general rule, that possession is *prima facie* evidence of property in negotiable

paper ; that it was an attribute of a bill of exchange or a promissory note, distinguishing it from all other parol contracts, that it carried with it, as part of its negotiable character, a presumption of consideration, and especially when it came into the hands of one not a party or privy to its creation ; that such a person must be presumed to be a *bona fide* holder for a valuable consideration, and that to impeach his right to recover, it was necessary for the defendant to repel the presumption of law in favor of the holder, by proof which should at least create a suspicion of the fairness of his possession. Without multiplying cases to corroborate what I deemed the established general rule in this respect, I will refer to a few as expressing my notions of it. The case of *Collins* v. *Masters*, 1 *Bos. & Pul.* 548, in which Chief Justice Eyre, in delivering the opinion of the court, says, that no evidence of want of consideration or other ground to impeach the apparent value received, was ever admitted between the acceptor or drawer and the third person holding the bill for value ; that the rule is so strict that it will be presumed that he does hold for value until the contrary appears ; that the *onus probandi* lies on the defendant ; that if the defendant can prove that the possessor gave no value for the bill, then the possession is in privity with the first holder, and will be affected by every thing which would affect the first holder ; but that for the purpose of rendering bills of exchange negotiable, the right of property passes with the bills, and the holder with the bill takes the property, and his title is stamped upon the bill itself. In *King* v. *Wilson*, 2 *Campb.* 5—7, Lord Ellenborough ruled that the possessor of a note will not be called upon to show his title to it, or the consideration given for it, without evidence from the other side that he obtained the possession of it by bad faith, or at least under suspicious circumstances. The principle was there distinctly asserted, that possession of itself was presumption of ownership, for a valuable consideration, which the other side must repel, and that a contrary rule compelling the holder to show that he gave a valuable consideration would greatly impair the credit and impede the circulation of negotiable paper. In *Riddle* v. *Mandeville*, 5 *Cranch*, 322, Chief Justice Marshall expresses it, as the clear opinion of the court, that

ALBANY,
Dec. 1835.
Morton
v.
Rogers.

the endorsement of a note is *prima facie* evidence of value received by the endorser, and that it was incumbent on the party objecting, to repel the presumption by proof that the fact was otherwise. In the supreme court of this state, the same doctrine was certainly maintained as long ago as *Conroy* v. *Warren*, 3 *Johns. Cas.* 259, and as lately as *Dean* v. *Hewitt*, 5 *Wendell*, 257, and *Brown* v. *Tabor, id.* 566. In the form'r case Justice Thompson says that it was a principle necessary for maintaining and facilitating that commercial intercourse that is carried on by means of them, that bills of exchange and promissory notes should *prima facie* import a consideration ; and Chief Justice Kent, in the same case, recognizes the rule to be, that a holder of a bill or not payable to bearer need not prove a consideration unless he possesses it under suspicious circumstances. In the two latter cases, Justice Marcy, delivering the opinion of the court, admits the rule to be, that the court will not inquire into the right of a holder of negotiable paper to maintain a suit for its recovery, unless circumstances appear showing his possession to be *mala fide ;* and that if a note is put into circulation fraudulently, there must be circumstances proved bringing knowledge of the fraud to the holder, in order to defeat his right to recover.

But though I supposed the general rule to be, as expressed by the distinguished judges to whose opinions I have just referred, yet I was not unaware that there were some exceptions to it, or rather, as I apprehended, some cases in which particular facts were deemed to rebut the general presumption in favor of the holder of negotiable paper, that he had possessed himself of it for a valuable consideration ; but until this argument I had not supposed that any of those cases went further than where it was proved that the maker, or some rightful holder of the paper, was dispossessed of it involuntarily : in other words, that the general presumption in favor of the holder's having received it for a valuable consideration was only repelled by proof that the last person in possession, who could lawfully negotiate or circulate it, did not in fact negotiate or circulate it. Thus, where a negotiable paper is proved to have been lost, it might be considered a fair presumption that it was found by the person who appears as the holder of it,

and this presumption would rebut the general presumption which otherwise would attach in favor of his possession. So where negotiable paper has been stolen, a presumption that the holder was privy to the felony would rebut the general presumption in his favor, and cast suspicion on his possession. The same also where the instrument was extorted from the maker or lawful owner of it by duress, or where either of them was disposessed of it by gross fraud, and without intention or consent on his part in any way to negotiate or circulate it. But where a person delivers bills of exchange or promissory notes to another, for him to negotiate for a specified purpose, and he fraudulently negotiates them for a different purpose, I have not supposed that this fact repelled the general presumption in favor of the holder's having obtained them for a full consideration ; and still less did I suppose that this presumption was repelled in case of a voluntary delivery of a note by the maker of it, by proof that he was induced to make it by fraudulent representations or by a misapprehension of facts. It certainly would greatly diminish the value and usefulness of a species of credit incalculably multiplied and immensely important to a commercial community like ours, to allow the maker of a note who has voluntarily parted with it, to come into court and impeach the holder's right of possession, by proving that it was given without sufficient consideration, upon a misrepresentation or a misapprehension of facts. It is evident, that ordinarily in such a case, unless the negotiation of such instruments is to be deemed of itself a cause for suspicion, there is no more reason for imputing to the holder a knowledge of the circumstances attending the original making, than there is to impute a like knowledge to the endorsee or holder of every negotiable instrument. It is in this respect entirely distinguishable from cases of a lost or stolen note, in which there has not intervened a known possessor who could give to the holder a rightful possession.

It may be said, I know, that as the law protects the holder in his right to recover, if he shall have obtained the bill or note for a full consideration, notwithstanding it shall have been fraudulent or without valid consideration at its original concoction, there is no hardship in requiring him to prove that

he acquired the possession *bona fide* and for full value. Cer-
tainly there would be no peculiar hardship in this rule, more
than there is in the rules relating to the acquisition of other
kinds of property, if it were well established and generally
understood. But though there might be no hardship as re-
spects its application to the holders of negotiable paper, there
would be, I think, great impolicy as respects its effect upon
this great and indispensable instrument of trade. While bills
of exchange and promissory notes in some form, constitute
the medium of exchange, the representative of the property
of the country, and in a great measure its currency, and
consequently the basis of general credit and basis, it is na-
tural and indeed inevitable that they should often pass from
hand to hand, for considerations known only by the parties
to the transfer. It would therefore greatly impair the con-
fidence in these instruments of trade, and cripple their use-
fulness, if the holder of them, for a light cause, could have
his title impeached, and be required to sustain it by positive
proof of the time, place and circumstances of his acquiring
it. As the course of commercial and other business now is,
a *bona fide* holder might be involved in serious inconvenience
and difficulty to make out the fact, and would sometimes be
defeated of his security, though he had obtained it fairly, in
full confidence of the unimpeachable nature with which the
law had clothed this species of paper. If to the embarrass-
ment to which this doctrine subjects promissory notes, there
be added the one arising out of another doctrine which has
lately obtained, and which I am inclined to think is no bet-
ter founded in principle or authority : I mean the doctrine
that the consideration of a promissory note is impeachable
in the hands of a *bona fide* endorsee, taking it in payment
or security for a precedent debt—the two embarrassments
together are fitted to produce an important change in the
circulation and usefulness of negotiable paper. Whether it
be wise for the purpose of defeating occasional frauds, and
of accomplishing exact justice in rare cases, to produce this
change, is a matter about which different opinions may
be entertained ; but, for my own part, I agree with
an early and distinguished judge of this state, that if a
man carelessly or by imposition give a negotiable note, it

ALBANY,
Dec. 1835.

Morton
v.
Rogers.

is better he should pay it than that the whole system be shaken.

The opinion expressed by the supreme court in this case, that where the original consideration of a note is impeached for fraud, the presumption that an endorsee obtained it *bona fide* and for full value is so far rebutted, that he must prove the fact, certainly is sustained by some recent English cases, particularly by those of *Thomas* v. *Newton*, 2 *Carr. & Payne*, 606, and *Mann* v. *Lent*, 1 *Moody & Malk*. 240, decided first at *nisi prius* before Lord Tenterden, and afterwards in bench, as reported 10 *Barn. & Cress*. 877 ; and it is also sustained by implication from the language of the court in *Woodhull* v. *Holmes*, 10 *Johns. R.* 231.   In regard to the English decisions, I do not propose to say more than that, though they are made by learned judges, they are regarded, even in the country where made, as an innovation on previously received opinions, and as in conflict with many former decisions ; besides, the authority of these decisions, though entitled to great respect, is not binding on us, as it would have been were the decisions of an earlier date ; and why the reasons given for them are not satisfactory to me, I have already endeavored to explain.   The direct point in *Woodhull* v. *Holmes* was the competency of an endorser to prove that a promissory note was put into circulation fraudulently, subsequently to his endorsement of it ; and though the court did, somewhat incidentally, express the opinion that as the note was put into circulation by fraud, the holder would be bound to show himself a *bona fide* possessor, yet they distinctly admitted that the question presented was not whether the facts offered in evidence by the defendant were sufficient to oblige the plaintiff to show that he gave a valuable consideration for the note, but whether the endorser could be admitted to prove those facts.   No notice was taken by the court of the previous decisions in *Cruger* v. *Armstrong*, 3 *Johns. Cas.* 5, and *Conroy* v. *Warren*, *id.* 259 ; at least no intimation is expressed of an intention to overrule the principle of them, which certainly was done if the case is authority to the extent now claimed. But admitting the American authorities to be no more harmonious and reconcileable with each other than the

English, and that both are equally divided on this point, which would be conceding more than can be fairly claimed, still I shall, without hesitation, adhere to the rule which I believe public policy points out as sound and salutary. This rule, as it has been generally understood, I think, both by the profession and the commercial community, is, that the endorsee of negotiable paper shall be presumed to have obtained it *bona fide* and for value, unless it be proved that the maker or a previous holder was dispossessed of it without his consent, or that the plaintiff is in fact a party or privy to the fraud complained of. Until this latter fact is proved, in cases where the paper has been voluntarily issued, the endorsee should not be required to show that he gave value, nor the defendant be allowed to prove that he received none.

But the present case is *sui generis*, having no clear analogy with any other case which I have been able to find. Grimshaw having an open account with the defendants, on the settlement of it, falsely pretends that he is the owner and holder of a certain bill of exchange for which the defendants were liable, and thereby induces them to allow him the amount of it in the account, and to give their note for the balance. This note at his request was made payable to Gwathmey, among whose effects, in the condition it was first executed, it is afterwards found by the plaintiffs, who are his assignees under the insolvent law. The important question is, in what attitude do the plaintiffs present themselves to the court? and especially can they be regarded as endorsees of negotiable paper? In the first place it cannot be doubted that the plaintiffs, coming to the possession of the note merely through their character of assignees of an insolvent, only represent Gwathmey, and that the same rules of law and evidence can be urged against them as could be against him were the suit in his name. Next, I am disposed to think, notwithstanding the suspicious circumstance of Grimshaw's being insolvent when the note was executed, that its subsequent possession by Gwathmey cannot be deemed a mere trust possession for Grimshaw, but that Gwathmey is to be regarded in the same relation as though the defendants, at Grimshaw's request, had themselves delivered the note to

Morton
v.
Rogers.

him. And what is this relation? Is it that of an endorsee of a negotiated note? Certainly not; on the contrary, he presents himself simply as the payee of the note, and in this character he cannot claim in his favor that presumption of ignorance of the original transaction, which from motives of public policy the law extends to an endorsee. Being the payee, he is in law, if not in fact, a party and privy to the creation of the note. It is no reply, that the circumstances proved show that he was not present when the note was concocted; for however ignorant or innocent he may have been of the fraud, he still remains the payee, and is not in fact an endorsee of the note; and being payee, he cannot claim, nor is there good reason why he should claim the peculiar privilege which the law, for public policy more than for regard to individual rights, and sometimes in derogation of individual rights, attaches to an endorsee. Besides, the facts will not warrant the presumption that Gwathmey took the note without knowledge of the consideration for which it was given. He saw that he was payee, and it must be presumed that he ascertained why he was made so. The fact that it was a negotiable note does not, as I can perceive, make the least difference. Between the payee and the maker of a note the rights and relations of the parties are precisely the same, whether the note be or be not negotiable; and in this case Gwathmey has no greater rights against the defendants than he would have if they, instead of giving the note, had stated the account and all the transactions between them and Grimshaw, and had subjoined an agreement in consideration of the premises to pay the balance, or part of the balance, due to Gwathmey.

In this view of the case, I shall vote for affirming the judgment of the supreme court.

On the question being put, *Shall this judgment be reversed?* all the members of the court voted in the negative. Whereupon the judgment of the supreme court was affirmed.

<div align="right">Judgment affirmed.</div>